IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RENATA BARSKI, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:17-cv-03593-PX |
| CYBERDATA TECHNOLOGIES, INC., | * | |
| Defendant. | * | |
| | *** | |

## MEMORANDUM OPINION

Pending in this employment discrimination case is a motion for summary judgment filed by Defendant Cyberdata Technologies, Inc. ECF No. 58. Also pending is Plaintiff Renata Barski's motion for reconsideration of this Court's February 13, 2020 Order. ECF Nos. 70, 71. The motions are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, Plaintiff's motion for reconsideration is DENIED and Defendant's motion for summary judgment is GRANTED.

**I.   Background[1]**

**A. Barski's Employment and Staffing on the WRDS Project**

The following facts are undisputed unless otherwise stated. Plaintiff Renata Barski ("Barski") is a software engineer with more than twenty years of experience. ECF No. 66-3. In March 2014, Barski accepted a position with Cyberdata Technologies, Inc. ("Cyberdata"), to

---

[1] Barski asks this Court to reconsider its denial of her requests for extension of time and its striking that portion of her summary judgment response in excess of the established page limit. ECF No. 71. Courts will reconsider interlocutory decisions based on: (1) a change in controlling law; (2) additional evidence that was not previously available; or (3) a showing that that the prior decision was clearly erroneous or manifestly unjust. *See Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 814 (D. Md. 2011); *see also Pritchard v. Wal-Mart Stores, Inc.*, 3 F. App'x 52, 53 (4th Cir. 2001) (citation omitted) (Where a party "merely requests the district court to reconsider a legal issue or to 'change its mind,' relief is not authorized.'"). Although the Court denies the motion to reconsider, it has reviewed the Barski's summary judgment response including the stricken pages and exhibits; even taking Barski's arguments and all exhibits into account, summary judgment must still be granted in favor of Cyberdata.

provide software engineering and architectural support on government contracts.  ECF No. 66-2; ECF No. 58-2 at 1.

Cyberdata secured a contract with the National Oceanographic and Atmospheric Administration ("NOAA") in 2014 and assigned Barski to work as a project manager on NOAA's Water Resource Data Service ("WRDS") project.  *Id.*; ECF No. 58-3 at 3.  The WRDS team consisted of federal employees and private contractors from Cyberdata and the University Corporation for Atmospheric Research ("UCAR").  ECF No. 67-1 at 6; ECF No. 58-4 at 2-4.  Alex Harmon ("Harmon"), a NOAA employee, was the project's primary manager and Barski's direct supervisor.  *Id.* at 2.  Harmon reported to Jon Roe ("Roe"), also a NOAA employee, who oversaw Cyberdata's NOAA work.  *Id.* at 3.  Also, in June 2015, UCAR contractors Barbara Rasaiah and John McEnery ("McEnery") joined the team.  ECF No. 67-1 at 6.

Barski's primary role on the project was to design and develop baseline architectural software to collect and manage data in the possession of the government and private actors, including satellite, metrological, and hydrological data.  *Id.* at 3.  Given the technical complexity of the project, the initial stages of development required Barski to work with government employees staffed on the project to understand NOAA's needs and then, based on those needs, identify the best technical solution.  *Id.* at 4.  Barski was also expected to work closely with Harmon to aid his understanding of the various technical concepts that would be implemented.  *Id*.

In August 2015, after several productive months on the WRDS project, Barski's working relationship with Harmon began to fray.  *Id.* at 6-7.  Barski took issue with Harmon's preference for the design solution proposed by McEnery, a hydrologist by training.  *Id.* at 6; ECF No. 66-7 at 1; ECF No. 66-11 at 2.  Barski was convinced that McEnery had proposed a "technically

inferior" solution, and that Harmon's elevation of McEnery's solution over hers revealed a "sexist favoritism." ECF No. 67-1 at 7-8. Barski inferred this discriminatory animus because, to her, it was "simply illogical" for Harmon to choose McEnery's proposed solution when she had "vastly more experience and expertise." *Id.* at 8. This tension was exacerbated by Barski's perception of McEnery's misogynistic treatment of her. *Id.* at 8, 19. As evidence of McEnery's supposed misogyny, Barski points to McEnery's "contemptuous attitude" and his inability to perform as a team player. *Id.* at 8.

Barski communicated her displeasure to Harmon via email. In late January 2016, Barski met with Harmon and Ed Clark ("Clark") from NOAA, to discuss her concerns. *Id.* at 9. She voiced her grievances about the technical errors in McEnery's solution, the lack of team-wide collaboration, and an "overall lack of respect towards her." *Id.* Later that day, Roe emailed Barski, informing her that she was being reassigned to NOAA's "Baseline Architecture" project. ECF No. 66-8. Roe explained that after speaking with three of his employees on the project including Harmon, NOAA could make "best use" of her expertise in the "Software and Data Infrastructure" division, run by project manager Kelley Eicher. *Id.;* ECF No. 67-1 at 9.

In February 2016, Barski sought guidance from Gerald Stark ("Stark"), her supervisor at Cyberdata, about her reassignment and the events leading up to it. *Id.* at 10. Stark reassured Barski that he would discuss with Roe her concerns but advised Barski against sending a lengthy grievance letter that she had prepared to send Roe. ECF No. 66-9 at 1. Stark updated Barski several days later on his discussion with Roe and Clark and advised as follows:

> Everything they said made sense. You have to remember the government has the right to do what's in the best interest of the government. As I understand it the input you provided did not provide the best solution for the desired result. This had more to do with the types of data and science rather than the pure IT results. results. Don't read too much into that. However, both were very very

> confident that your Senior Level Architecture skills were still very much required across several other areas, including the work with Kelly, infrastructure and several other projects that Jon mentioned.

ECF No. 66-10.

Two weeks later, Barski emailed Roe directly, taking issue with the feedback she had received from Stark. ECF No. 66-11 at 3-4. She specifically addressed with Roe the criticism that her technical solution did not achieve the "desired result" given its prioritization of "IT results" over "types of data and science." *Id.* at 4. She also defended her proposed solution and highlighted that the lack of team collaboration and the "significant resistance" to her lead role as software engineer caused the problems with the WRDS project. *Id.* Barski also complained about the failure to address issues she raised about McEnery. *Id.* Roe did not respond directly to Barski's email.

### B. Barski's Work on the Baseline Architecture Project for NOAA

Barski was ultimately reassigned to the Baseline Architecture ("BA") project in late January 2016. ECF Nos. 66-8 & 66-12. However, because the software design aspects of the project were not yet underway, Barski was asked in the interim to assist with recruiting candidates for open software engineering positions in Tuscaloosa, Alabama. ECF No. 67-1 at 14. Barski's role was to provide Brooke Tindell, a recruiter and Cyberdata employee, with the position qualifications, assess interviewed candidates for requisite experience, and help find candidates with the required skill set. *Id.*; ECF No. 66-13.

Barski quickly became discontented with Tindell whom she perceived as undermining her and hampering recruitment efforts. *Id*. In May and June 2016, Barski sent several emails to Cyberdata's Chief Operating Officer Jim Bailey ("Bailey") laying out her concerns. *Id.*; ECF No. 66-14. Barski complained that Tindall "should consider the notion that the Hiring Manager

and the VP of Science and Engineering have perhaps an iota of understanding about these positions"; and that Tindall now "overtly asks Gerald to approve every single micro step in the process." ECF No. 66-13 at 2. Then on June 15, 2016, Barski complained about Tindall to Tindall's supervisor Catherine Zako ("Zako") via email, copying Bailey and Stark. ECF No. 66-15. Barski's complaints ranged from Tindell's "misuse[]" of Barski's "candidate feedback," to "generally ma[king] a nuisance of herself regarding rejected candidates." *Id.*

Bailey, in response, emailed Stark and Zako that he would "try and get to the bottom of this," but also suggested that the company begin "sourcing for a new PM" to replace Barski. ECF No. 66-16 at 3. Zako suggested that Bailey and Stark meet with Barski in person to discuss her grievances. ECF No. 66-17 at 1. The meeting took place a week later, during which Barski voiced her frustrations about Tindall on the BA project and Harmon on the WRDS project. ECF Nos. 66-18 & 66-19. From that meeting, Bailey acknowledged Barski had "some legitimate issues." ECF No. 66-18 at 1.

Meanwhile, throughout the course of the summer, Barski grew increasingly frustrated with the NOAA candidate search. ECF No. 66-21 at 1. In early August, Barski emailed Stark to update him that her software design skills would not be needed until another phase of the BA project wrapped up in mid-August. *Id.* at 3. In that exchange, she also criticized the client's project manager, Kelley Eicher, for not valuing her input, "despite [her] having more diverse experience." *Id.* at 2.

### C. Barski's Removal from the NOAA Contract and her Termination

Several weeks later, Roe emailed Stark, copying two of his colleagues, stating that he no longer wanted Barski on the project. He stated:

> I and the [NOAA Office of Water Prediction] have pretty much come to the end of our rope with Renata Barski . . . . We have tried

> to find productive work for her to do on various projects over the last couple of years with very little success. She was supposed to contribute to the EDS project and the WRDS Development projects. I was asked months ago to remove her from both of those projects. We have tried to make her productive on the Baseline Architecture project. . . . She balked at being assigned to some software development tasks by Kelley Eicher, even though she is the same level resources as others on this task who do software development like Jingtao Deng. She provides the distinct impression that she is not interested in software development.

ECF No. 66-25 at 1. As further justification for removal, Roe also noted Barski's untimely completion of tasks (which resulted in her removal as manager on a prior project); her disrespect towards others in person and over email; her inability to work in a team environment; and working remotely on days when she was scheduled to be in the office. *Id.* Roe ended his email asking for Barski's removal from all NOAA projects. *Id.* After forwarding the email to Bailey, Stark responded to Roe: "We hear you loud and clear." *Id.* at 2.

One week later, on September 2, 2016, Stark notified Roe that he had removed Barski from the NOAA contract. *Id.* In Barski's place, Cyberdata advanced for NOAA's consideration as project lead Jingato Deng, a female software engineer also staffed on the project. *Id.* Stark also asked Cyberdata's recruiting office whether there were any suitable openings for Barski on other projects. ECF No. 66-23. Cyberdata ultimately terminated Barski later that day. ECF No. 66-24; ECF No. 58-3 at 29-30.

On December 4, 2017, Barski filed this action against Cyberdata, alleging gender discrimination and retaliation in violation of federal, state, and local law. ECF No. 1. After Cyberdata answered the Complaint, discovery ensued, culminating in Cyberdata's motion for summary judgment (ECF No. 58), and Barski's motion for reconsideration (ECF No. 71).

**II.     Standard of Review**

Summary judgment is appropriate when the Court, viewing the evidence in the light most

6

favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co*., 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted.  *Celotex*, 477 U.S. at 322.

Employing this standard, the Court addresses the propriety of summary judgment as to Plaintiff's discrimination and retaliation claims.

### III.     Analysis

#### A.  Gender Discrimination

Barski's discrimination claims have narrowed greatly since the filing of the Complaint.  *Compare* ECF No. 66-1 *with* ECF No. 1.  Barski initially claimed that Cyberdata had discriminated against her first by "allow[ing]" its client, NOAA, to engage in discriminatory

behavior and "fail[ing] to take . . . appropriate corrective action"; and also by refusing to reassign or give her another chance to maintain her employment at Cyberdata, when similarly situated males were given that opportunity. ECF No. 1 ¶¶ 32-33. Barski now defends against Cyberdata's summary judgment motion only as to her second theory of relief.[2] ECF No. 66-1 at 44–47.

Title VII provides that it is unlawful "for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Maryland courts also apply the Title VII framework to discrimination claims brought under state and local law. *See Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 498 n.2 (D. Md. 2019); *Dyer v. Oracle Corp.*, No. PWG-16-521, 2016 WL 7048943, at *2 n.5 (D. Md. Dec. 5, 2016); *Idris v. Ratner Co./Creative Hairdressers*, No. TDC-14-1425, 2014 WL 5382633, at *3 (D. Md. Oct. 21, 2014) (citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 504 (2007)). In discrimination cases, "the plaintiff bears 'the ultimate burden of persuading the court that [she] has been the victim of intentional discrimination.'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

---

[2] To the extent Barski also intended to pursue her first theory of relief, Cyberdata cannot be held liable for the alleged discriminatory behavior of NOAA personnel. Whether NOAA qualifies as a "joint employer" for purposes of Title VII liability is a robust inquiry that Barski in no way ventures to establish. *See Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). But assuming she had done so successfully, "joint employer liability does not by itself implicate vicarious liability, and a finding that two companies are an employee's joint employers only affects each employer's liability to the employee for their *own* actions, not for each other's actions." *Lee v. Mattis*, No. PX 17-2836, 2018 WL 3439261, at *12 (D. Md. July 17, 2018) (emphasis in original) (collecting cases from other circuits universally holding the same). Barski has marshaled no evidence to rebut Cyberdata's assertion that misconduct by NOAA employees Harmon or McEnery cannot be imputed to Cyberdata. Thus, any theory of relief based on Cyberdata's "allowing" non-Cyberdata personnel to discriminate against Barski, or its failure to "take corrective action" regarding misconduct carried out by non-Cyberdata employees, cannot survive challenge.

Plaintiff's discrimination claims rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, Barski must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she performed her duties satisfactorily; and that (4) similarly situated employees who were not members of the protected class were treated differently.  *See Hudson v. Joseph B. Fay Co*, 902 F. Supp. 85, 88 (D. Md. 1995); *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).

If Barski establishes this *prima facie* case, the burden shifts to Cyberdata to offer a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*; *see Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216–17 (4th Cir. 2016).  The burden then shifts back to Barski to raise a genuine issue of material fact as to whether the proffered reason is a mere pretext for discrimination.  *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001).  Notably, Barski must generate sufficient evidence from which a reasonable factfinder may conclude that Defendant "discriminate[d] against [her] with respect to [her] compensation, terms, conditions, or privileges of employment, *because of* [her] . . . sex."  42 U.S.C. § 2000e–2(a)(1) (emphasis added); *see also McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015); *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995) (the "crucial issue" is an employer's "unlawfully discriminatory motive" and "not the wisdom or folly of its business judgment"); *see also Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 528 (W.D.N.C. 2015) ("[I]t is not the Court's province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the action.).

9

It is undisputed that Barski is a member of a protected class and that her discharge on September 2, 2016, constituted an adverse employment action.[3]  Cyberdata, however, contends that Barski has failed to generate sufficient evidence that similarly situated males were treated differently.  ECF No. 58-1 at 10-11; ECF No. 72 at 19-20.  Cyberdata alternatively contends that, assuming Barski establishes a *prima facie* case, it has generated sufficient evidence that Barski was terminated for legitimate, non-discriminatory reasons.  ECF No. 58 at 11.  On both points, the Court agrees with Cyberdata.

First, with respect to Barski's *prima facie* showing, when viewing the record evidence most favorably to Barski, no evidence supports that similarly situated male employees were treated differently.  *See Haywood v. Lock*, 387 Fed. Appx. 355, 359 (4th Cir. 2010) (unpublished) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994) ("[P]laintiffs are required to show that they are similar in all relevant respects to their comparator.")); *see also Oguezuonu v. Genesis Health Ventures, Inc.*, 415 F. Supp. 2d 577, 584–85 (D. Md. 2005) (finding subordinates are not "similarly situated").

Barski offers three comparators and insists she was treated differently from each in that the male comparators were all given an opportunity to improve after their work was criticized where she was not.  ECF No. 66-1 at 45.  Barski's theory suffers from two fatal evidentiary flaws.  First, no evidence supports that the three identified male employees—Stein, Camacho, and Li—were similarly situated to Barski.  The only evidence offered by Barski in connection with Stein, Barski's predecessor on the WRDS project, is that he was reassigned to another

---

[3] At the summary judgment stage, Barski focuses only on her official termination on September 2016, as the "adverse employment action" she suffered.  ECF No. 66-1 at 28-32, 44-48.  Accordingly, the Court will not address Cyberdata's argument that Barski's reassignment in early 2016 was not "adverse employment action" for purposes of Title VII.  ECF No. 58-1 at 10-11.

10

project after he had "performance problems." ECF No. 67-1 at 28. Barski admits she did not work with Stein, and her understanding is based entirely on hearsay relayed to her by other individuals. *Id.* As for Li, he reported to Barski and was purportedly given a second chance on some nonspecific project when nonspecific performance issues arose. *Id.* at 29. Even on this information alone, Li's subordinate position to Barski disqualifies him from consideration as "similarly situated." *See Oguezuonu*, 415 F. Supp. 2d at 584–85 (finding that supervisor plaintiff's subordinates "by definition" were not "similarly situated" under the *McDonell Douglas* test). Camacho, too, reported to Barski on a previous NOAA project. ECF No. 67-1 at 29. No evidence supports that Camacho was ever a project manager or occupied a role similar to Barski. *Id.; see Oguezuonu*, 415 F. Supp. 2d at 584–85. Thus, no reasonable trier of fact could determine on this record that any of the three are suitable comparators.

Second, even assuming each occupied a substantially similar role at Cyberdata, Barski has not shown that she was "treated differently." Barski's primary contention is that unlike her male colleagues, she was terminated almost immediately after NOAA requested her removal from its contract in August 2016 and was given no opportunity to redeem herself. ECF No. 66-25. On this point, Barski identifies the relevant timeframe as between August 26, 2016, when NOAA sought her removal from the project, and September 2, 2016, when she was officially discharged. *Id.*; ECF No. 66-24.[4]

However, even when viewing the record evidence most favorably to Barski, she cannot demonstrate that any of the comparators experienced the same lengthy series of difficulties with a Cyberdata client as she did. Contrary to Barski's self-serving argument, the record reflects that

---

[4] In response to Cyberdata's argument that there is no formal "review and verify" mechanism when an employee is removed from a client project (ECF No. 58-1 at 10-11), Barski says that she was not forewarned or given a second opportunity to improve her performance. The Court assesses Barski's claim of disparate treatment with that clarification in mind.

Barski's problems on the NOAA contract began in January 2016. ECF No. 66-7. Barski was removed from WRDS as a result and reassigned to NOAA's BA project, led by a different project manager. ECF No. 66-8.

Next, Barski encountered a new round of difficulties working with Tindell, a highly regarded Cyberdata recruiter. ECF No. 66-16. Again, a new set of managers called for action to be taken in response to Barski's series of unprofessional emails that she sent to Cyberdata's upper management. ECF No. 66-13; ECF No. 66-14; ECF No. 66-15; ECF No. 66-16; ECF No. 66-17. Although Bailey recognized after his meeting with Barski in June 2016 that Barski may have raised "some legitimate issues" (ECF No. 66-18), this bright spot was eclipsed two months later, when NOAA supervisors alerted Cyberdata that they had "pretty much come to the end of [their] rope with Renata Barski." ECF No. 66-25. Barski was terminated one week later. ECF No. 66-24.

When viewing the record evidence most favorably to Barski, no evidence supports that she was not given "second chances" unlike her male counterparts. She indeed was given such chances, and nothing about Cyberdata's treatment of her supports any inference of discriminatory animus fueling her termination. For these reasons, Barski has failed to put forward sufficient evidence to make out a *prima facie* case.

However, and for similar reasons, even if Barski could establish a *prima facie* case, Cyberdata has articulated a legitimate, non-discriminatory basis for her discharge. Cyberdata received a lengthy and detailed email from Jon Roe, NOAA's Chief Project Officer, in which he shared that he had "tried to find productive work for [Barski] to do on various projects over the last couple of years with very little success." ECF No. 66-25. The email chronicled Barski's unwillingness to receive work from colleagues she viewed as less experienced; her inability to

12

complete tasks on time (which had led to her removal from a prior NOAA project); her routine teleworking when she was expected to demonstrate "on-site" leadership; and her disrespectful attitude towards others both in person and over email.  *Id*.  Before requesting Barski's removal from NOAA projects, Roe reminded Stark of their discussion months prior regarding Barski's "very poor ability to work in a team environment." *Id.*

By contrast, the Court can find no evidence that the proffered "reason was false *and* that discrimination was the real reason for the challenged conduct." *Jiminez*, 57 F.3d at 378 (citation omitted).  Although Barski characterizes Roe's "damning condemnation" in his August 2016 email as "disingenuous and misleading," she offers only her own opinion in support.  ECF No. 66-1 at 38; ECF No. 66-26.  Indeed, much of her purported rebuttal evidence rests on her own self-assessments about her abilities compared to other coworkers and her own perception that the lack of collaboration on the WRDS project was no fault of hers.  *Id.*  But an employee's self-evaluation alone cannot support that an employer's grounds for termination were illegitimate or pretextual.  *See Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir. 2000) (citations omitted); ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."); *Morrall v. Gates*, 370 F. App'x 396, 398 (4th Cir. 2010) (citing *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003)) ("Whether an employee is performing at a level that meets legitimate expectations is based on the employer's perception, and [plaintiff's] own, unsubstantiated assertions to the contrary are insufficient to stave off summary judgment.").

Barski also responds that Cyberdata's reason for firing her was pretextual because Cyberdata did not investigate, and then confirm or deny, each of the reasons that Roe gave as to why he wanted Barski removed from the NOAA contract before Cyberdata decided to fire her.  ECF No. 66-1 at 39; ECF No. 66-26.  To be sure, Cyberdata did follow up with NOAA

13

personnel about Barski's performance as early as February 2016. ECF Nos. 66-10 & 66-25. But more to the point, assertions that Cyberdata's diligence was wanting does not rebut the legitimate nondiscriminatory reasons that Cyberdata has provided in support of terminating Barski. *Id*. Thus, when viewing the evidence in the light most favorable to Barski, she cannot demonstrate that Cyberdata's stated reasons for her termination were pretextual. Cyberdata is entitled to summary judgment with respect to the discrimination claims.

### B. Retaliation

Barski also contends she was terminated in retaliation for complaining about the "sexist favoritism" exhibited by NOAA personnel on the WRDS project. ECF No. 66-1 at 35. Barski relies in particular on her June 2016 meeting with Bailey and Stark during which she expressed frustration that Harmon had gradually shifted her primary responsibilities to her misogynistic coworker McEnery, despite his "lack of knowledge" in software engineering. ECF No. 66-19.[5]

Title VII "prohibits retaliation against an employee who has opposed any practice made an unlawful employment practice by Title VII."[6] *Demasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); 42 U.S.C. § 2000e–3(a). To make out a *prima facie* case of retaliation, Barski must demonstrate that: (1) she engaged in protected activity; (2) Cyberdata took an adverse action against her; and that (3) a causal link exists between the two. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). The employer can also rebut plaintiff's *prima facie*

---

[5] Although Barski claims that this meeting was the culmination of several emails she sent her supervisor Gerald Stark about this issue (ECF No. 66-1 at 36), the record instead reflects that the meeting was arranged after Barski complained about a different coworker on a new assignment. ECF No. 66-17; ECF No. 66-18; ECF No. 66-19.

[6] State and local anti-retaliation laws are in pari materia to Title VII, 42 U.S.C. § 2000e-3. *See Brennan.*, 361 F. Supp. 3d at 498 n.2; *Idris*, 2014 WL 5382633, at *3; *Whittaker v. David's Beautiful People, Inc.*, No. DKC-14-2483, 2016 WL 429963, at *2 (D. Md. Feb. 4, 2016); *Dyer*, 2016 WL 7048943, at *2 n.5 (citing *Haas*, 396 Md. at 504) (with regard to Title VII, Maryland law, and Montgomery County Code, "it is appropriate to consider federal precedents when interpreting state and local laws"). Thus, Barski's state and federal retaliation claims rise and fall together.

case by articulating non-retaliatory reasons for its actions. *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (citations omitted). The burden then shifts back to plaintiff to establish pretext. *Id.* Because Barski cannot demonstrate that she engaged in protected activity or the existence of a causal link between the protected activity and her termination, her retaliation claims do not survive challenge.

Protected activity entails an employee "oppos[ing] any practice made an unlawful employment practice by Title VII." *Demasters*, 796 F.3d at 16 (discussing U.S.C. § 2000e–3(a)). But Barski's complaint to Cyberdata's senior management concerned the behavior of a NOAA employee. ECF No. 66-19. Her complaints, therefore, did not concern an "unlawful employment practice" on the part of Cyberdata. *Demasters*, 796 F.3d at 416-17 (discussing *Crawford v. Metro. Gov't of Nashville & Davidson Cty*, 555 U.S. 271, 276 (2009); 42 U.S.C. § 2000e–3(a)). Because NOAA's misconduct cannot be imputed to Cyberdata, and Cyberdata could not remedy NOAA's bad acts, Barski did not engage in protected activity as related to Cyberdata. *See Demasters*, 796 F.3d at 418; *Lee*, 2018 WL 3439261, at *12.

Alternatively, even if the Court assumes that Barski's complaint amounted to protected activity, she has also failed to produce sufficient evidence of a causal connection between her complaints and her termination. *See Strothers*, 895 F.3d at 335; *Lettieri*, 478 F.3d at 650; *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 165 (D. Md. 2000). Barski was terminated on September 2, 2016, about two-and-a-half months after her meeting with Bailey and Stark. ECF Nos. 66-19 & 66-24. Although temporal proximity can be "sufficient to establish a causal connection at the prima facie stage," *Strothers*, 895 F.3d at 336–37, a "lapse of two months between the protected activity and the adverse action . . . weaken[s] significantly the inference of causation," *Horne v. Reznick Fedder & Silverman*, 154 F. App'x. 361, 364 (4th Cir. 2005) (per

15

curiam) (quoting *King*, 328 F.3d at 151 n.5).  And any potential inference of causation in this case is further undermined by the undisputed evidence that Cyberdata management had considered firing Barski before they knew the precise details of her complaints against Harmon and McEnery.  *Compare* ECF No. 66-16 *with* ECF No. 66-19; *see Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Horne*, 154 F. App'x. at 364 (any causal inference is rebutted by fact that concerns about plaintiff's work performance predated the protected activity).

In the end, Barski has marshalled no evidence that her complaints about a NOAA employee's misogyny are causally related to Cyberdata terminating her.  *See Hart v. Lew*, No. ELH-12-03482, 2015 WL 521158, at *28 (D. Md. Feb. 6, 2015), *aff'd*, 612 F. App'x 688 (4th Cir. 2015) ("[Plaintiff] must show that there is a genuine dispute of material fact as to whether she would have been terminated in the absence of the alleged wrongful action or actions of the employer.") (quotation marks and citation omitted)); *see also Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 210–11 (4th Cir. 2014) (refusing to base its decision on allegations of retaliation on whether or not the termination decision was "wise, fair, or even correct.").

Even if Barski could make out a *prima facie* retaliation case, once again, she has not generated sufficient evidence to demonstrate that her termination was pretextual.  Barski insists that Roe's August 26 email was "contradictory and illogical," and thus could not be grounds for Cyberdata's employment decision.  ECF No. 66-1 at 38.  But no evidence supports her characterization.  ECF Nos. 66-25 & 66-26; *see Jaudon*, 125 F. Supp. 2d at 165.  In this respect, Barski's attempts to poke holes in Roe's criticisms of her performance do not carry the day.  ECF No. 66-1 at 41.

Similarly, Cyberdata's so-called "praise" of Barski in a contract prospectus does not undermine that Barski was fired for legitimate nondiscriminatory reasons. *Id.*; ECF No. 66-6. The prospectus was dated two days before Cyberdata learned that NOAA no longer wanted Barski on its projects. *Compare* ECF No. 66-6 at 1 *with* ECF No. 66-25. Thus, no rational trier of fact could conclude that a single reference to Barski's historic good performance undermines Cyberdata's stated ground for firing her, as reflected in the numerous reasons that NOAA demanded her removal. Summary judgment is granted in Cyberdata's favor on the retaliation claims.

### IV. Conclusion

For the foregoing reasons, Plaintiff's motion for reconsideration (ECF No. 71) is DENIED, and Defendant's motion for summary judgment (ECF No. 58) is GRANTED. A separate Order follows.

August 4, 2020  /S/
Date  Paula Xinis
United States District Judge